UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CASE NO.: 1:17-CR-37-HAB |
| ) | |
| WALTER GROSS, JR. ) | |
| ) | |

## OPINION AND ORDER

Walter Gross, Jr. ("the Defendant") filed a Motion for Compassionate Release/Reduction in Sentence Pursuant to § 3582(c) (ECF No. 69) on October 19, 2020. Pursuant to this Court's General Order 2020-11, the Court referred the Motion to the Northern District of Indiana Federal Community Defenders, Inc. ("FCD") for it to consider representing the Defendant with respect to his motion. (ECF No. 72). On October 28, 2020, the FCD filed its Notice of Non-Representation. (ECF No. 73). Thereafter, the Government filed its response to the motion (ECF No. 76). The Defendant did not reply and the matter is ripe for consideration.[1]

## PROCEDURAL BACKGROUND

On February 3, 2017, the Fort Wayne Police Department (FWPD) received a tip from the National Center for Missing and Exploited Children which indicated that over 500 files of child pornography had been uploaded to a file sharing program from a particular IP address. (Presentence Investigation Report "PSR", ECF No. 51, at ¶12). FWPD tracked the IP address to the Defendant at a home in Fort Wayne, Indiana.  Officers obtained and served a search warrant

---

[1] At the time he filed his motion, the Defendant was housed at FCI Elkton in Lisbon, Ohio. After the filing of his motion he was transferred to FCI Fort Dix. This caused some delay in Gross' mail and some of his legal mail was returned "undeliverable" to the Clerk. For this reason, the Court re-sent filings to Gross' updated mailing address (ECF No. 75) and waited additional time for Gross to file any reply. Gross has since filed a letter with the Court advising of the change of address. (ECF No. 82). As noted, he has not filed any reply.

at the Defendant's home where they recovered certain computer hardware containing 539 files. (*Id.* at ¶13). The Defendant admitted that the hardware and devices recovered were his and advised that they contained child pornography. The Defendant then advised investigators how he obtained child pornography on the internet. An FBI agent assigned to the case reviewed the images on the Defendant's computer devices and determined that they depicted minors engaged in sexually explicit conduct. Specifically, one video depicted an adult placing an index finger inside a naked 7-10 year-old female's vagina. (*Id.* at 18). Another video showed an approximately 7-11 year old female's mouth open and white colored substance on her tongue and right cheek area. A male's penis was positioned directly in front of the child's mouth.

On June 28, 2017, the Defendant was indicted for knowingly utilizing interstate commerce to receive visual depictions involving minors engaging in sexually explicit conduct (Count 1 – 18 U.S.C. § 2252(a)(2)) and for possession of material involving the sexual exploitation of minors (Count 2 –18 U.S.C. § 2252(a)(4)(B)). He pled guilty to count 2 and was sentenced to 120 months imprisonment with five years of supervised release to follow. The Defendant is presently incarcerated at FCI Fort Dix in Trenton, New Jersey with an anticipated release date of March 7, 2027.

## DISCUSSION

The Defendant's Motion requests a sentencing modification. Generally, a court is statutorily prohibited from modifying a term of imprisonment once imposed. *See* 18 U.S.C. § 3582(c). A handful of statutory exceptions exist, however, one of which permits the court to grant an inmate compassionate release if the inmate meets certain requirements. *See* 18 U.S.C. § 3582(c)(1)(A). Under this provision, a court may not modify a term of imprisonment except that –

>   (1) in any case --
>
>   (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, . . . finds that—
>
>   (i) extraordinary and compelling reasons warrant such a reduction …
>
>   … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

The Government concedes that the Defendant has exhausted his administrative remedies at his facility and that his motion is properly before the Court. Thus, the Court turns to the substance of the Defendant's request, his contention that he has demonstrated "extraordinary and compelling reasons" for his release.

The Defendant asserts that his age (61) combined with a host of medical conditions warrant compassionate release. (ECF No. 69 at 2–3). Specifically, the Defendant lists 15 conditions from which he asserts he suffers including: obesity, diverticulitis of intestine, sleep apnea, gastroesophageal reflux disease with esophagitis, Barrett's esophagus, duodenal ulcer, hiatal hernia, irritable bowel syndrome, colon polyps, pre-diabetes, major depressive disorder, anxiety, insomnia, allergic rhinitis, and fibromyalgia.[2] Additionally, the Defendant has concerns about his mother, her ability to care for herself and the hardship she has endured due to his incarceration. His concern is mirrored by the Defendant's mother, Caroline Gross, in a letter submitted to the

---

[2] Additionally, the Defendant notes "rheumatology" as a condition from which he suffers. Rheumatology, however, is a branch of medicine devoted to the diagnosis and therapy of rheumatic diseases, sometimes called musculoskeletal diseases. https://www.webmd.com/rheumatoid-arthritis/an-overview-of-rheumatic-diseases.

3

court asking for the Defendant's release to care for her. She indicates she is nearly 81 years old and desires the Defendant's assistance to run errands, help her around the house, and provide for her financially. (ECF No. 83).

Congress did not define "extraordinary and compelling reasons" in the statute, instead delegating the matter to the Sentencing Commission to promulgate a policy statement that "describe[s] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The policy statement, contained in United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 and the accompanying Application Notes, have not been amended to reflect the First Step Act's change to § 3582(c)(1)(A) allowing prisoners to bring compassionate release claims directly before the court. *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). Accordingly, "§ 1B1.13 and its application notes provide useful – but not binding – guidance to courts in determining whether a defendant has identified an extraordinary and compelling reason for compassionate release." *United States v. Hoskins*, No. 2:99 CR 117, 2020 WL 7640408, at *2 (N.D. Ind. Dec. 23, 2020) (citing *Gunn*, 938 F.3d at 1180). Indeed, "[d]istrict judges must operate under the statutory criteria–'extraordinary and compelling reasons'–subject to deferential appellate review." *Gunn,* 980 F.3d at 1181.

Using the guidance of §1B1.13 to inform the statutory criteria, the court considers the medical condition of the defendant, his age, his family circumstances, and whether there exists in the defendant's case an extraordinary or compelling reason "other than or in combination with" the other reasons described in the Application Notes.[3] Second, the Court determines whether the

---

[3]However, as *Gunn* made clear, the policy statement's requirement that the court consider whether the reduction is otherwise "consistent with this policy statement" does not limit a district judge's discretion. This is because the statute by which the district court is bound requires a reduction to be consistent with "applicable policy statements." And, the Sentencing Commission has not yet issued a policy statement

4

Defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Finally, the Court considers the § 3553(a) factors, "to the extent they are applicable." U.S.S.G. § 1B1.13.

Additionally, when the Defendant moves for a reduction based on COVID-19, Courts have also considered: (1) the specificity of the defendant's COVID-19 concerns, (2) whether the defendant has a medical condition that makes him especially susceptible to the dangers of COVID-19, and (3) the extent that the defendant's release would mitigate or aggravate the COVID-19 pandemic. *See United States v. Council*, No. 1:14-CR-14-5-TLS-SLC, 2020 WL 3097461, at *5–7 (N.D. Ind. June 11, 2020); *United States v. Barrett*, No. 2:17-CR-1, 2020 WL 3264112, at *3 (N.D. Ind. June 17, 2020); *see also United States v. Davis*, No. 2:19-CR-74-3, 2020 WL 1951652, at *1–2 (N.D. Ind. Apr. 23, 2020) (applying similar factors to consider whether there was a "compelling reason" for pretrial release due to the COVID-19 pandemic). In the context of the COVID-19 pandemic, "§ 3582(c)(1)(A) contemplates a sentence reduction for specific individuals based on the individuals' particular circumstances of where he is housed and his personal health conditions." *See Council*, 2020 WL 3097461, at *5; *United States v. Melgarejo*, No. 12-cr-20050, 2020 WL 2395982, at *3 (C.D.Ill. May 12, 2020).

Ultimately, however, it is Defendant's burden to establish that a "compassionate release" is warranted under the statute. *United States v. Wesley*, 2020 WL 3868901, *1 (D. Kan. July 9, 2020); *see also United States v. Bright*, 2020 WL 473323, at *1 ("extraordinary and compelling" imposes a heavy burden on a defendant seeking relief under Section 3582(c)(1)(A)).

---

"applicable" to the Defendant's request. Thus, *Gunn* held, "[a]ny decision is 'consistent with' a nonexistent policy statement." *Gunn*, 980 F.3d at 1180.

As noted, the Defendant lists a number of conditions and diagnoses to attempt to sustain his burden. To aid the Court in navigating through the Defendant's assertions, the Government filed the Defendant's medical records with the Court. (ECF No. 87). Those records are quite telling in that they confirm that the Defendant's list can be substantially pared down to a few ailments that are both pertinent to the analysis before the Court and supported by the medical record.

The Court can first eliminate the ailments for which there is simply no medical evidence. These include the Defendant's assertions of a fibromyalgia diagnosis, obesity and sleep apnea. The Defendant's fibromyalgia condition, if it exists, is unsupported by any medical records before the Court and has not been the subject of any treatment at the BOP. At most, the records note the Defendant's self-reporting of a history of fibromyalgia. (ECF No. 87 at 124, 181). His report of obesity is equally unsupported in the record. The last medically recorded weight for the Defendant from May 2020 shows the Defendant stands 5'8" tall with a weight of 185 lbs, equating to a BMI of 28.1. (ECF No. 78 at 21). A BMI of 25-29.9 places the Defendant in the overweight category (which the Court shall address *infra*) but not the obese category, as he asserts. Finally, the Defendant's diagnoses of sleep apnea and use of a CPAP machine are absent from any medical documentation before the Court.[4]

This leads the Court to the group of ailments that are verified by the medical records but appear to be managed and treated appropriately by the BOP. The diagnoses of anxiety disorder, Barrett's esophagus without dysplasia, gastro-esophageal reflux disease, irritable bowel syndrome, allergic rhinitis (seasonal allergies) and major depressive disorder are all supported in the records. However, contrary to the Defendant's assertion that since the pandemic "all chronic care and tests

---

[4] The records do support that, at times, the Defendant has difficulty sleeping. But, these issues appear to be connected with his mental health rather than through a separate problem caused by sleep apnea. (ECF No. 87 at 16, 111, 192).

were eliminated" (ECF No. 69 at 5), it is clear the Defendant has been evaluated on numerous occasions since the onset of the pandemic and provided all medical care necessitated by these illnesses.

For instance, he was evaluated by Health Services on October 16, 2020, as part of his intake protocol at FCI Fort Dix. (ECF No. 87 at 33). He denied any current mental health complaints, or painful conditions. (*Id.*). His medications were reviewed and continued. Before that, on October 5, 2020, his ongoing medication regimen for each of his ailments was reviewed in a "non-contact encounter" with a notation that an "in-clinic" appointment would be scheduled when normal operations are resumed. However, the records indicate Defendant made no complaints regarding his medications or treatment nor did he indicate he was having any current problems.

Prior to this medication check, in May 2020, the Defendant was seen at the chronic care clinic for a gastrointestinal and mental health evaluation. Notes from that visit indicate that the Defendant's anxiety and depression were "well-controlled on present meds" and that his EGD and colonoscopy in February 2020 showed chronic gastritis but that the recommended course of treatment was a repeat EGD in three years. Consistent with the notes from the May 2020 visit, records from February 24, 2020, show that the Defendant received an EGD and colonoscopy. On March 13, 2020, the Defendant was seen by Health Services and informed he had been approved for the medication pantoprazole. Thus, there is no indication from the Defendant's medical records that any of his medical needs or complaints are not being addressed or managed well within the BOP.

All this said, the Government notes that while the Defendant is not obese, the Center for Disease Control ("CDC") does recognize that the Defendant's status as overweight is a comorbidity that *might* increase the risk of serious injury or death from COVID-19. *See* People

Who Are At Increased Risk for Severe Illness, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html  (last accessed January 4, 2021).[5] The Government further acknowledges that the risk for severe illness with COVID-19 increases with age and that "people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s," while the "greatest risk for severe illness" is among those aged 85 and older. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html(last accessed January 4, 2021). However, the Government argues that the Defendant's age, without additional substantial comorbidities, places him on the lower end of the risk spectrum.

The Court agrees with the Government's assessment. The Defendant appears to suffer from a few illnesses, all of which the BOP is actively managing and providing follow-up care as needed.[6]  The Defendant is in his early 60s and qualifies as overweight but, even so, without any additional risks, this Court is loathe to find that this condition, which is capable of fluctuation and potentially within the control of the Defendant, is sufficient to constitute extraordinary and compelling circumstances. If it were, nearly every incarcerated individual and a majority of the people in the United States would meet this standard. https://www.cdc.gov/obesity/data/prevalence-maps.html; *see also United States v. Meyer*, No. 14-CR-230, 2020 WL 6287697, at *8 , fn. 9 (E.D. Wis. Oct. 27, 2020)("Nearly 3/4 of the American people are either obese or overweight, see Roni Caryn Rabin, Extra Pounds May Raise Risk of Severe Covid-19, N.Y. Times, Oct. 10, 2020, so it may be difficult for a court to conclude that such a condition, without more, will qualify as unusual or extraordinary for purposes of compassionate release.")

---

[5] The Court notes that while diabetes, types 1 and 2, are risk factors that increase or might increase the risk of severe illness from COVID-19, pre-diabetes, which the Defendant asserts he has, is not.
[6] The Defendant has also failed to show that he is unable to provide self-care while incarcerated. *See United States v. McCloud,* No. 1:17-CR-57 HAB, 2020 WL 5406182 at *3 (N.D. Ind. Sept. 9, 2020)

Next, the Defendant urges the Court to consider compassionate release based upon his family circumstances, namely his concern for his aging mother and her ability to continue caring for herself without his assistance. While the Court is sympathetic to the concerns of the Defendant regarding the health of his aging mother, "family circumstances that would amount to an extraordinary and compelling reason [for compassionate release] are strictly circumscribed under the [applicable United States Sentencing Commission] policy statement and do not encompass providing care to elderly parents." *United States v. Goldberg*, No. 12-180 (BAH), 2020 WL 1853298, at *4 (D.D.C. April 13, 2020); *see also* U.S.S.G. § 1B1.13 cmt. n.1(C) (limiting family circumstances that may be considered an adequate reason for a sentence reduction to the need to care for the defendant's minor children or a spouse or registered partner, when no other caregiver is available). Thus, "[c]ourts have not considered a parent's or grandmother's health as an 'extraordinary and compelling' reason under 18 U.S.C. § 3582(c)(1)(A)." *United States v. Stewart*, No. 1:16-CR-89-HAB, 2020 WL 5406181, at *3 (N.D. Ind. Sept. 9, 2020); *see also, United States v. Bonel*, No. 4:14-CR-180 (4), 2020 WL 3470319, at *3 (E.D. Tex. June 25, 2020) (defendant's contention that she "is needed at home to help her grandmother," while commendable, does not meet the requirements for family circumstances that establish extraordinary and compelling reasons for release from imprisonment); *United States v. Baye*, No. 3:12-CR-00115-RCJ, 2020 WL 2857500, at *10 (D. Nev. June 2, 2020) (denying defendant's compassionate release motion to care for his widowed mother's deteriorating health); *Goldberg*, 2020 WL 1853298, at *4 (denying compassionate release motion and stating that "a desire to care for one's elderly parents does not qualify as an 'extraordinary and compelling' reason for release" under 18 U.S.C. § 3582(c)(1)(A)); *United States v. Ingram*, No. 2:14-cr-40, 2019 WL 3162305, at *2 (S.D. Ohio July

9

15, 2019) (denying compassionate release motion to care for defendant's ill mother because "[m]any, if not all inmates, [have] aging and sick parents").

Finally, the Defendant has expressed concern about the ability of the BOP to contain the COVID-19 virus, a concern that is borne out by increased positivity rates at that facility since the filing of his Motion. As of the date of this Opinion and Order, the entire country has experienced a surge in COVID-19 cases. The United States recently exceeded 20 million confirmed positive cases and 350,000 deaths attributed to the virus. Given that this pandemic is raging among the general population, it is not surprising that the BOP has not been spared. Fort Dix, FCI, a low security facility housing over 2,743 inmates, is currently reporting 586 positive inmate cases, 120 positive staff, 0 inmate or staff deaths and a combined 393 inmates and staff recovered. This is currently the highest number of positive inmates at a BOP facility. While this is certainly troubling for the Defendant, the BOP has put in place protocols and restrictions to reduce the risk to the inmate population. The absence of any deaths at Fort Dix is evidence that those protocols have aided in keeping inmates as safe as possible in the context of the BOP setting. Moreover, hope is on the horizon. Vaccines have been approved and an aggressive vaccination campaign is underway.

The Court recognizes the Defendant's concerns and is not downplaying the risk the Defendant could face. However, that risk is present even among the general population. The marginally elevated risk that the Defendant has compared to a younger person even when combined by the increased positivity rates at Fort Dix FCI, simply do not rise to the level of extraordinary and compelling circumstances.[7] *See United States v. Raia,* 954 F.3d 594, 597 (3d

---

[7] It is also noteworthy that the Defendant has been tested multiple times for COVID-19 and has tested negative each time. (ECF No. 87 at 1, 9, 13). He was housed at Elkton prior to his transfer to Fort Dix and managed to remain negative during the large outbreak in that facility in early 2020.

10

Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release.").

Finally, even if the Court determined that Defendant met his burden to show conditions warranting compassionate release, the Court would ultimately deny the Defendant's request for a sentencing modification in light of the §3553(a) factors. The Defendant was sentenced to 120 months for his offense. This sentence was imposed to reflect the seriousness of the offense, promote respect for the law as well as to afford adequate deterrence and to protect the public from further crimes of the defendant. The Defendant asserts that his absence of prison discipline demonstrates that he is not a danger to society. This Court simply cannot agree.

The Defendant's offense involved over 500 images of child pornography and as the Government emphasizes, this was not the Defendant's first child pornography conviction. Prior to the instant offense, he was convicted of two state counts of felony possession of child pornography. The PSR described the facts underlying those convictions in this way:

> The files contained images of pre-teen girls performing sexual acts on each other, pre-teen girls performing oral sex on a male, and photos of undeveloped girls. A forensic analysis returned over 70,000 images on the defendant's computer, and many of the images were of child pornography. There were seven video clips of girls who appeared to be between the ages of eleven and sixteen having oral, anal and vaginal intercourse with adult male subjects; nine video clips of pre-adolescent girls at nudist camps; and one video of two female teens being penetrated by someone's hand.

(PSR, ¶37). To say that the nature of the Defendant's actions in not only the present case but also in his first case are "serious," would grossly understate the depravity of the offenses. Rather, the Defendant here is the poster child for the Sixth Circuit's recent commentary that, "[c]hild pornography is an abhorrent offense that scars the children affected forever. And it doesn't take an economist to know that demand drives supply." *United States v. Schrank*, 975 F.3d 534, 536 (6th Cir. 2020). Indeed, "[b]y repeatedly downloading images of young children being raped," the

11

Defendant here contributed to their past victimization, fueled the demand for child pornography and contributed to the future harm all these children face. *Id*. Given these circumstances, and the notion that "general deterrence is crucial in the child pornography context," *see United States v. Bistline*, 720 F.3d 631 (6th Cir. 2013), the Court cannot conclude that the Defendant does not pose a significant threat to the community as no prior intervention by authorities has curbed his penchant for viewing and downloading child pornography. The Court finds that the significant sentence reduction that Defendant seeks would greatly undermine the above statutory purposes of sentencing.

In sum, because this Court does not find extraordinary and compelling circumstances exist for the Defendant's release and a reduction of sentence is inconsistent with the § 3553(a) factors, Defendant does not meet the criteria for compassionate release and his motion is DENIED.

## CONCLUSION

Based on the foregoing, the Defendant's Motion (ECF No. 69) is DENIED.

So ORDERED on January 5, 2021.

s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT